## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ALFREDO CUTCHON, ZONETH
CORALDE, and GARNER PAJUNAR,
*individually and on behalf of all others*
*similarly situated,*

Civ. Action No.:  23-cv-11165

*Plaintiffs,*

**COLLECTIVE &**
**CLASS ACTION COMPLAINT**

*v.*

JURY TRIAL DEMANDED

ADEX MEDICAL STAFFING, LLC,

*Defendants.*

Plaintiffs Alfredo Cutchon, Zoneth Coralde, and Garner Pajunar, individually and on behalf of all others similarly situated, by their undersigned attorneys Towards Justice and Kakalec Law PLLC, as and for their Complaint, allege as follows:

### INTRODUCTION

1.    Defendant Adex Medical Staffing, LLC ("Adex") is a labor recruiter that recruits, hires, and places foreign nurses and other healthcare workers to work in healthcare facilities in the United States.

2.    According to its website, Adex is "different from the rest" of nurse staffing agencies because it "Represents You" (the nurse), takes "No Fees At All From You" (the nurse), "Only Earns Fees By Billing the Hospital During the Life of Your Contract" (the nurse's contract), and provides nurses with a "Support Structure During the Life of Your Contract." *See* https://adexmedical.com/why-choose-us/ (accessed Dec. 21, 2023).

3.    But in reality, Adex's business model involves trapping immigrant nurses in relatively low-paying jobs when compared with what U.S. nurses are earning.

1

4.      Further, Adex prohibits nurses from leaving their employment for years unless they pay tens of thousands of dollars in penalties, which it calls "termination fees" and "remainder fees."

5.      Adex follows through on its threats to require these payments from nurses by initiating legal action, including arbitration proceedings, against those who dare to leave.

6.      Defendant profits from this scheme of placing immigrant nurses into positions that the nurses cannot freely leave.

7.      Plaintiffs Alfredo Cutchon, Zoneth Coralde, and Garner Pajunar are immigrant nurses originally from the Philippines who came to the United States on visas sponsored by Adex.

8.      Plaintiffs all wish to leave their jobs at Adex, for financial and personal reasons, but fear financial and legal ruin if they do so.

9.      This lawsuit seeks to end Defendant's illegal practices and to compensate victims through two categories of claims.

10.     First, Plaintiffs, on their own behalf and on behalf of a Class of all healthcare workers who entered the U.S. through Defendant's foreign nurse recruitment program, and who were subject to Defendant's contracts requiring them to pay a 'termination fee' and 'remainder fee' to leave their jobs before the end of the contract term, assert forced labor claims under federal law. Employers are not permitted to use or to attempt to use the threat of substantial harm, including financial harm, or abuse of legal process to keep workers trapped in their jobs. Defendant's threat of extraordinary financial penalties, and its requirement that these penalties be enforced through arbitration proceedings that could themselves result in further penalties (through the requirement that the losing party in arbitration pay arbitration costs and attorneys' fees), violates the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589, and contravenes the

spirit of a competitive labor market, to the detriment of Defendant's workers and their competitors who play by the rules.

11.     Second, Plaintiffs, on their own behalf and on behalf of those similarly situated, assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et esq.*, based on the penalties Defendant requires nurses to pay to leave Defendant's employ before their contractual employment period ends. These penalties are grossly disproportionate to any actual expenses that Defendants incurred solely for the employees' benefit. Rather, Defendant uses the money to pad its own profits. Even more, Defendant threatens workers through the financial burden of arbitration, including seeking repayment of the costs of arbitration and Defendant's attorneys' fees, if workers leave their jobs before their contract periods are up without paying Defendant the penalty for leaving, or if they attempt to bring suit to enforce their rights. In other words, Defendant attempts to place the burden of doing business squarely on the backs of the nurses they profit from, in violation of the FLSA.

**THE PARTIES**

12.     Adex is a California limited liability company with offices in New York and Florida.

13.     Adex's office in New York ("Adex's Manhattan office") is located at 509 Madison Avenue, Suite 1916, New York, New York 10022.

14.     A number of Adex employees involved in the recruitment and placement of Plaintiffs and other nurses are based at Adex's Manhattan office, including Chief Operating Officer Tina Loh and Director of Recruitment Justin Leibowitz.

15.     Plaintiff Alfredo Cutchon is a Registered Nurse who was recruited, hired, and placed in a nursing position in Nashville, Tennessee by Defendant.

16.     Plaintiff Zoneth Coralde is a Registered Nurse who was recruited, hired, and placed in nursing positions in Okaloosa County, Florida by Defendant.

17.     Plaintiff Garner Pajunar is a Registered Nurse who was recruited, hired, and placed in a nursing position in Pampa, Texas by Defendant.

18.     Plaintiffs consent in writing to becoming parties in this action. True and correct copies of their FLSA consent to sue forms are attached hereto as Exhibit 1.

19.     Throughout their employment, Defendant was an "employer" of Plaintiffs as defined by the FLSA.

20.     Throughout their employment, Plaintiffs were non-exempt "employees" of Defendant as defined by the FLSA.

21.     Throughout their employment, Defendant "employed" Plaintiff within the meaning of the FLSA.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question) because Defendant's conduct violates the TVPA and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, insofar as Defendant's conduct was directed in part from Adex's New York City office and by individuals based in that office. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Adex resides in Manhattan, and within the meaning of 28 U.S.C. § 1391(c)(2) because Adex is subject to the court's personal jurisdiction as it maintains an office in this district, and because Adex, the only Defendant, is a resident of New York.

## BACKGROUND

### I.    DEFENDANT'S BUSINESS

24.    Adex is a healthcare staffing company based in New York that recruits trained nurses and other foreign healthcare workers from the Philippines and elsewhere, brings them to the United States, and sells their labor to healthcare facilities, including hospitals.

25.    Adex profits by charging these healthcare facilities more for healthcare workers' labor than it pays the workers in wages. Therefore, the longer healthcare workers work, the more Defendant profits from their labor.

26.    Adex's clients (the healthcare facilities) benefit from the arrangement as well through, among other things, obtaining the labor of expert healthcare workers at a time when providers across the country allegedly face challenges attracting qualified healthcare workers. Adex and similar companies that recruit foreign healthcare workers can provide labor that is less expensive than domestic nurse companies.

27.    Adex's contracts with immigrant nurses include harsh and abusive financial penalties if nurses leave their jobs before the end of their purported commitment periods, enabling Adex to subject nurses such as Plaintiff and the members of the Class to low wages and high patient-to-nurse staffing ratios without fear that they will seek out work elsewhere.

28.    Exacerbating the coercive force of these penalties, the contracts include a forced arbitration provision that contains a "loser-pays" cost and fee-shifting provision, which Defendant uses to threaten nurses with being subjected to arbitration proceedings and having to pay tens of thousands of dollars of Defendant's legal bills, as well as potentially thousands of dollars in arbitration costs, in the event they decide to leave their jobs.

## II.    PLAINTIFFS ARE RECRUITED AND FORCED INTO UNFAIR AND ILLEGAL CONTRACTS

29.    Mr. Cutchon, Ms. Coralde, and Mr. Pajunar are experienced Registered Nurses.

30.    Mr. Cutchon worked for nineteen years as a nurse, first in the Philippines and then in Dubai.

31.    Ms. Coralde worked for fifteen years as a nurse in Saudi Arabia.

32.    Mr. Pajunar worked for twelve years as a nurse in the Philippines.

33.    Like many healthcare workers in the Philippines, Plaintiffs dreamed about becoming nurses in the United States. They thought coming to the United States would allow career advancement by working for highly regarded healthcare providers.

34.    In 2019, Plaintiffs each separately contacted Adex about possible work opportunities in the United States.

35.    At the time, Mr. Cutchon was working in Dubai, and Ms. Coralde was working in Saudi Arabia.

36.    Based on representations made by Adex, Plaintiffs believed they could trust and rely upon Adex to bring them to the United States and find them good jobs, under good conditions, with fair terms. So they agreed to work for Adex.

37.    In 2019, Adex required each of the Plaintiffs to sign a nonnegotiable "International Registered Nurse Services and Employment Agreement" (the "2019 Contract") for nurses that included several pages of fine print and legalese. Adex presented the contract to Plaintiffs on a take-it-or-leave-it basis.

38.    The 2019 Contract contained several unfair terms. For example, the 2019 Contract included a requirement that Plaintiffs work for Adex for 5200 hours of employment, the equivalent of approximately 2 years and 9 months (based on Plaintiffs' typical 36-hour workweek).

39.     If Plaintiffs left before the end of the term, the 2019 Contract provided that they would be required to pay Adex a "fixed partial termination fee" of $20,000.

40.     In addition, if Plaintiffs left before the end of the term, they would be required to pay Adex an additional "Remainder Fee," which the agreement stated was needed to compensate Adex for "loss of profits" among other things. The Remainder Fee was set at $15,000 for leaving prior to completing 2000 work hours (approximately 1 year and 3 weeks) and $10,000 for leaving prior to 4000 hours (approximately 2 years and one and a half months). Only by completing at least 5200 hours (approximately 2 years and 9 months) of work could Plaintiffs avoid paying the remainder fee.

41.     Under the 2019 Contract, if Plaintiffs left before the end of the term, they could owe as much as $35,000 in "liquidated damages," which was how the agreement characterized these penalties. Plaintiffs did not have $35,000 to spend.

42.      Further, the 2019 Contract required that in the event that workers left their jobs prior to the end of the term, these fees were due in a lump sum prior to their final day of work for Adex. If workers did not pay the fees, Paragraph 10.1 of the 2019 Contract provided that workers would "bear the costs and be responsible for all EMPLOYER legal fees and costs, as well as the cost of collection in connection with payment of these fees," including in "arbitration, the court system and/or through a collection agency." (Emphasis in original).

43.     The 2019 Contract contained a non-compete provision that prohibited nurses from working for any other employer for the entirety of their time with Adex, and also prohibited nurses from working for any other employer within a 75-mile radius of the city and county where they last worked for Adex for 12 months, if they left their job early.

44.    The 2019 Contract also said that nurses would not be able to sue Adex in court but had to bring any claim against the company in arbitration in New York City. And even though arbitration can cost tens of thousands of dollars in fees and costs, not including the fees nurses might have to pay their own lawyers, the contract said that nurses could be required to bear not just their own costs, but also the attorneys' fees, legal costs, and arbitration costs of the employer under Paragraph 10.1.  Plaintiffs did not have the money to pay those costs.

45.    Finally, the 2019 Contract contained a statute of limitations shortening provision that said any legal claim that nurses had against Adex had to be filed within 6 months from the date of occurrence.

46.    In addition, the 2019 Contract did not specify the precise compensation that nurses would receive when they came to the U.S. and began their work. Instead, it included an "Exhibit C" stating that Adex would pay each nurse within a specific pay range, but also that that wage would be "at least a prevailing wage as determined by the US department of labor's prevailing wage determination (ETA 9141) over EMPLOYER's corporate headquarters as attached to the I-140 filing."

47.    The Exhibit C that Mr. Cutchon and Mr. Pajunar received stated that they would be paid an hourly wage "in the range of $22.00-$28.00 US dollars."

48.    The Exhibit C that Ms. Coralde received in November 2019 stated she would be paid an hourly wage "in the range of $22.00-$31.00 US dollars."

49.    Plaintiffs had to sign the 2019 Contract if they wanted to come to the United States. So they signed.

50.    After Plaintiffs signed the 2019 Contract, Adex required them to spend several months fulfilling administrative requirements for placement, including licensure, English

proficiency exams, birth certificates, transcripts, visa screening certificates, and medical examinations.

51.     Adex representatives based out of Adex's Manhattan office, including Adex employees Sandra Miranda and Caroline Oliveira, helped coordinate Plaintiffs' visa paperwork.

52.     Although Plaintiffs undertook all the tasks Adex required of them, they faced delays in receiving a response from United States immigration officials on their paperwork.

53.     In September 2019, Mr. Pajunar was sent an updated services agreement by Kimberly Harris, an Adex employee based at Adex's Manhattan office.

54.     In a cover letter including the updated services agreement, Ms. Harris explained that the main difference between this agreement and the earlier agreement was a change in the choice-of-law provision, so that the agreement was now governed by New York law.

55.     Again, Mr. Pajunar had to sign the updated services agreement if he wanted to come to the United States. So he signed.

### III.    PLAINTIFFS FACED UNFAIR AND UNDISCLOSED WORKING CONDITIONS IN THE UNITED STATES, BUT STAYED IN THEIR JOBS LONGER THAN THEY WOULD HAVE BECAUSE OF THE HEAVY PENALTIES THEY COULD FACE IF THEY LEFT.

56.     Mr. Cutchon came to the United States in April 2022.

57.     Mr. Pajunar came to the United States in April 2022.

58.     Ms. Coralde came to the United States in June 2022.

59.     Plaintiffs were not able to start work right away and begin completing their contract term. Instead, they were required to undergo a lengthy orientation in Florida—even though all had been nurses for many years.

60.     For much of the orientation, Plaintiffs were not engaged in meaningful training. Instead, they were stuck in corporate housing, paid a mere $300 a week, and unable to work and earn money to support themselves while they waited for their assignments.

61.     After Plaintiffs had come to the United States in 2022 and arrived in Florida for the orientation, Kathryn Christensen, Adex's Executive Operations Manager who was based in its Manhattan office, sent the Plaintiffs various versions of a new contract (the "2022 Contract") that they were told they must sign to begin their assignment in the United States.

62.     Having now relocated to the United States based on Adex's promise of a position, and having no other options as they were still bound by the terms of the 2019 Contract requiring payment of termination fees and remainder fees if they did not begin their assignment with Adex, Plaintiffs signed their respective versions of the 2022 Contract.

63.     The 2022 Contract reiterated that Plaintiffs would, if they left their employment early, be subject to a "fixed termination fee" and a "remainder fee." The fees varied and were calculated slightly differently among the Plaintiffs' contracts.

64.     Mr. Pajunar and Ms. Coralde's contracts stated that they would pay a "fixed termination fee" of $20,000, and a "remainder fee" that would vary based on how many hours remained in the contract term at the time they left. The Remainder Fee was set at $15,000 for leaving prior to completing 2000 work hours (approximately 1 year and 3 weeks) and $10,000 for leaving prior to 4000 hours (approximately 2 years and one and a half months). Only by completing at least 5200 hours (approximately 2 years and 9 months) of work could Plaintiffs avoid paying the remainder fee.

65.    Mr. Cutchon's contract stated that he would pay a "fixed termination fee" of $15,000, and a remainder fee that would be calculated as his hourly rate ($26.00) times the number of hours remaining in his contract.

66.    All the versions of the 2022 Contract claimed that the "termination fee" represented a "fair and reasonable estimate of the expenses, fees and costs paid on behalf of the Employee by Employer pursuant to this agreement."

67.    All the versions of the 2022 Contract claimed that the "remainder fee" was to be paid "in consideration for the services provided to and on behalf of the Employee by Employer, and which further includes lost revenue, expenses, marketing efforts, representations made and relied upon by Client(s) as to long term assignment, actual placement at Client Facility, disruption of business, extreme difficulty in replacement and other damages associated with breach and termination of this Agreement[.]"

68.    These fees are not the only financial harm that Adex suggested it could inflict on Plaintiffs if they left their jobs early. In addition to its purported damages, the 2022 Contract states that Plaintiffs would "bear the costs and be responsible for all Employer legal fees and costs, as well as the cost of collection in connection with payment of these fees, and which includes through arbitration, the court system and/or through a collection agency."

69.    Thus Plaintiffs would be required to pay all of Adex's attorneys' fees and costs, and the costs of an arbitration that Adex would bring against them, if they left their jobs early and could not immediately pay the required penalties. These fees and costs could amount to tens of thousands of dollars in additional penalties.

70.    Again, Plaintiffs did not have the money to pay all of these fees and costs.

71.     The 2022 Contract also included changes to the arbitration provision in the 2019 Contract. Specifically, the 2022 Contract required any arbitration to be done in accordance with the Commercial Rules of the AAA, and that all parties were required to bear their own "costs, fees and expenses including attorneys' fees" in connection with arbitration—except that Adex could still recover its attorneys' fees and costs if Plaintiffs left their jobs early.

72.     Accordingly, while Adex could recover its attorneys' fees in an arbitration proceeding against Plaintiffs based on leaving their jobs early, Plaintiffs could not do the same if they were to bring an arbitration proceeding against Adex for any reason—thus curtailing their ability to potentially enforce their statutory rights under the TVPA or the FLSA through arbitration.

73.     The 2022 Contract was also the first time Plaintiffs learned their specific hourly pay rates and were officially told of their work location.

74.     Mr. Cutchon was informed he would be paid $26.00 per hour and would be working at TriStar Centennial Health Center in Nashville, Tennessee.

75.     Mr. Pajunar was informed he would be paid $26.00 per hour and would be working at Pampa Regional MC in Pampa, Texas.

76.     Ms. Coralde was informed she would be paid $29.00 per hour and would be working in Fort Walton, Florida.

77.     Plaintiffs were not informed whether they were, in fact, being paid prevailing wage.

78.     The 2022 Contract also stated that Plaintiffs would be paid $300 gross per week during Adex's required Orientation Phase, which the agreement stated that the parties agreed "satisfies and exceeds the minimum payment required for compensable time worked by Employee during the Orientation Phase based on the applicable state minimum wage then in effect."

79.     After over two months of waiting, in July 2022, Adex placed Mr. Cutchon with its client Tristar Centennial Medical Center, in Nashville, Tennessee—even though his contract said he would begin in June. He began working there on approximately July 18, 2022.

80.     After over four months of waiting, in October 2022, Adex placed Ms. Coralde with its client HCA Florida Fort Walton-Destin Hospital, in Fort Walton Beach, Florida. She began working there on approximately October 10, 2022.

81.     After over two months of waiting, in July 2022, Adex placed Mr. Pajunar with its client Pampa Regional Medical Center, in Pampa, Texas. He began working there on approximately July 10, 2022.

82.     Plaintiffs' work experience was very different from what they had been told to expect. Adex promised workplaces that treated nurses and patients with a basic level of respect, but once they began working at their placements, Plaintiffs' working conditions were a far cry from what had been described to them when they signed up with Adex.

83.     Ms. Coralde, for example, was at first placed in an intensive care unit, a different position than she had been hired for, which was to be a transitional care nurse. She was also told she needed to work night shifts, which did not work for her for medical reasons.

84.     Eventually, in January 2023, Ms. Coralde's placement was changed by the hospital at her request, to another unit that was part of the same hospital but at a location in Destin, Florida. Ms. Coralde had sought Adex's help in changing her placement, but did not receive assistance from Adex.

85.     Plaintiffs also discovered that they were being paid lower wages than their U.S. colleagues who were not Filipino nurses working for Adex, even though those colleagues were performing the same jobs.

86.     Mr. Cutchon discovered that he was earning roughly the same, or less, as his U.S. colleagues who were newly-graduated from nursing school doing the same job as him.

87.     Ms. Coralde discovered that her U.S. colleagues doing the same job as her were earning $10 more per hour than she was.

88.     Mr. Pajunar discovered that a U.S. colleague doing the same job as him in the ICU was earning $6 more per hour.

89.     Mr. Pajunar also discovered that med-techs—who do not have nursing degrees—from other healthcare staffing agencies were earning $3 more per hour than him.

90.     Plaintiffs also discovered that Adex had made other promises it would not keep. For example, Adex promised Mr. Pajunar a merit increase in his pay rate after he completed half his contract hours (i.e., 2,600 hours) working for Adex. But when that time came to pass, he never received a merit increase.

91.     As another example, Adex promised Plaintiffs a minimum workweek of 36 hours. But there were a number of weeks when Plaintiffs did not receive their guaranteed minimum hours, creating serious financial hardship for them. This hardship was compounded by Adex's non-compete clause.

92.     Plaintiffs raised concerns about their pay and working conditions with Adex employees based in New York, including Chief Operating Officer Tina Loh. But those employees told Plaintiffs that nothing could really be done about these issues.

93.     Plaintiffs wanted to leave Adex behind, but feared financial ruin for doing so because of the enormous financial penalties outlined in their contracts with Adex, which they lacked the money to pay.

94.    Plaintiffs knew other nurses who had decided to leave Adex before the end of their contract term, and also knew that Adex had taken aggressive action against them to recover the penalties.

95.    Ms. Coralde knew at least one other nurse who paid tens of thousands of dollars in penalties, but who was only able to do so by borrowing significant amounts of money from family and friends, who she is now in debt to.

96.    Mr. Cutchon knew another nurse who had been threatened with immigration-related consequences by Adex's attorneys. Specifically, that nurse received an email from Adex's lawyer stating that Adex will ask USCIS to do something about her sponsorship, and demanding that she pay $35,000 in termination fees immediately or return to work. As a result of these immigration and financial threats, that nurse was forced to hire an attorney and incur further financial costs.

97.    Court records provide additional evidence of Adex's enforcement actions against other nurses who leave their jobs early.

98.    For example, in 2019, Adex filed an arbitration against Ivy Ortua Villaruel, a nurse who left her job before the end of the contract term. Adex sought and received an arbitration award of $80,880 in liquidated damages against Ms. Villaruel, which it then had confirmed in New York Supreme Court.[1]

99.    Because of their fear about financial ruin and potential immigration-related consequences, Plaintiffs stayed in their jobs for many months longer than they would have absent these threats of financial and legal harm.

---

[1] *See Adex Medical Staffing, LLC v. Ivy Ortua Villaruel*, Index No. 656917/2019, NYSCEF No. 10 (Sup. Ct., N.Y. Cty. Apr. 21, 2020).

100.    For each Plaintiff, however, the situation in their jobs with Adex has become untenable and they feel they have no choice but to leave their jobs.

101.    For Mr. Pajunar, the situation got to a breaking point when he received a message from his daughter's teachers about her mental health. He learned from the teachers that his daughter, who moved to Maryland with Mr. Pajunar's wife for personal reasons after the family moved to the United States, is quite depressed by being separated from her father for so long.

102.    After receiving this news, on November 6, 2023, Mr. Pajunar told Adex he wanted to end his contract with Adex so he could reunite with his family.

103.    As Mr. Pajunar wrote to Adex staff by email, "My children are suffering from depression right now and I don't want to gamble their mental health. As a father to my kids, their health is much more important to me right now. My daughter's teacher even called last week telling me she's not doing good in school because she kept saying she misses her dad. Because of this, I am deciding to terminate my contract."

104.    But Adex was indifferent to Mr. Pajunar's family's suffering.

105.    First, Kathryn Christensen, Executive Operations Manager from Adex, who is based in Adex's Manhattan office, wrote to Mr. Pajunar on November 10, 2023 telling him that his resignation notice was "with upper management for review." Also copied on the email were Adex executives including Chief Operating Officer Tina Loh, who is based in Adex's Manhattan office.

106.    Then, weeks later on November 28, 2023, Ms. Christensen wrote Mr. Pajunar telling him that he owed Adex $30,000 in penalties—a $20,000 "fixed termination fee" and a $10,000 "remainder fee" since he had completed more than 2,000 hours but less than 4,000 hours

of work—and that this money had to be paid before his last day of employment. Ms. Loh was again copied on this communication.

107. Mr. Pajunar then asked whether he could pay Adex back over time, on some type of payment plan. But Ms. Christensen told him that "we don't do payment plans." As a result, she said he was required to pay the fee in full by his last day of employment, January 6, 2024.

108. Mr. Pajunar does not have $30,000 to pay these penalties, and he gravely fears the financial and legal consequences of going forward with his resignation. Nevertheless, he feels he has no other choice but to end his employment with Adex on January 6, 2024.

109. On December 21, 2023, Ms. Christensen again wrote to Mr. Pajunar to "follow up on your breach fees," saying: "Please be reminded you need to make payment before 1/06/24."

110. For Ms. Coralde, the situation came to a breaking point in November when Adex suddenly announced that she would have to relocate to a new client facility in Tallahassee.

111. Weeks before the scheduled relocation, Ms. Coralde started having shifts canceled, and Adex delayed paying her minimum guaranteed hours of work on time. With fewer shifts and more limited income, she was unable to pay her rent and basic bills.

112. This included being unable to make mortgage payments on a property Ms. Coralde owned in the Philippines.

113. Ms. Coralde was extremely fearful of the financial consequences of leaving her position. Still, considering her long-term wellbeing, Ms. Coralde felt she had no choice but to leave.

114. Mr. Cutchon desired to leave his job with Adex early so he could earn more money to support himself, as his wage of $28.00 per hour was barely enough to pay his basic bills.

115.    Mr. Cutchon was also concerned about patient safety. As a critical care nurse in the intensive care unit, the recommended nurse-to-patient staffing ratio is 1 nurse to 2 patients. But Mr. Cutchon was almost always assigned to 3 patients. This higher-than-recommended ratio, he feared, put his patients in danger. Despite raising concerns to Adex, Adex did not address the situation.

116.    But Mr. Cutchon was very afraid of Adex's termination and remainder fees. For him, the remainder fee as of December 9, 2023 would be calculated at $79,205 ($28.00 times 2,828.75 hours remaining in his contract). Mr. Cutchon does not have this amount of money available.

## IV.    PLAINTIFFS' INABILITY TO PAY TERMINATION FEES, REMAINDER FEES, ATTORNEY'S FEES, OR THE COSTS OF AN ARBITRATION PROCEEDING AGAINST THEM.

117.    Plaintiffs cannot afford to pay termination fees, remainder fees, or the potential costs of Defendant's attorney's fees and arbitration costs in an arbitration proceeding Adex would bring against them.

118.    Plaintiffs are hourly-paid, at-will employees who have been earning approximately $800 to $835 per week, after taxes are taken out. A major portion of their pay goes directly to rent. The remainder goes to basic living expenses such as household bills, food, and transportation costs.

119.    Plaintiffs simply cannot afford to pay $30,000 in termination/remainder fees to Adex. As set forth above, they have been making relatively low wages, and are struggling to meet their families' basic needs. They have had no way to save nearly enough money to pay Adex tens of thousands of dollars in one lump sum before they have even departed their employment.

120.    Adex's overbroad and overly restrictive non-compete clauses compound Plaintiffs' inability to increase their earnings and pay down their debts, acting as a further restraint on their mobility and providing Adex with an additional means to keep nurses trapped in their jobs.

121.    Moreover, leaving Adex exposes Plaintiffs to tens of thousands of dollars more in liability, including potential arbitration costs of any arbitration proceeding Adex might file and Adex's attorney's fees.

122.    The costs of arbitration at the AAA include a filing fee of $1,900, and a case management fee of $750, all of which Adex could potentially recover from Plaintiffs if they were to file and prevail in an arbitration against Plaintiffs.

123.    The costs of arbitration also include the arbitrator's compensation. In the arbitration proceeding initiated by Adex against Ivy Ortua Villaruel referenced above, the arbitrator's compensation was $9,000. Arbitration Award, *Adex Medical Staffing, LLC v. Ivy Ortua Villaruel*, Index No. 656917/2019, NYSCEF No. 4. In an arbitration against Plaintiffs, the rate of the arbitrator selected could be even higher.

124.    Ultimately, the arbitrator's time alone in any proceeding would likely cost thousands of dollars, if not tens of thousands of dollars—all of which Defendant could potentially recover from Plaintiffs if Defendant was to file and prevail in individual arbitrations.

125.    Under the Arbitration Provision, Plaintiffs would also be required to pay Adex's attorney's fees and costs if Adex were to file and prevail in arbitration. Those fees could easily run into the tens of thousands of dollars or more.

126.    Plaintiffs lack the means to pay their own attorneys to represent them in the arbitrations—let alone the arbitrator's compensation or the potentially enormous attorneys' fees and costs that could be incurred by Adex.

127.    As the Court in a similar case involving the use of arbitration fees and costs to coerce Filipino nurses' continued labor, *Vidal v. Advanced Care Staffing, LLC* observed, "[w]hether the amount is fixed or projected, employers' threats to collect tens of thousands of

dollars in contractual damages from hourly workers certainly can violate the TVPA's prohibitions on forced labor." *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-5535 (NRM)(MMH), 2023 WL 2783251, at *15 (E.D.N.Y. Apr. 4, 2023).

## COLLECTIVE ACTION ALLEGATIONS

128.    Plaintiffs brings their FLSA claims, Counts V and VI, as a collective action under 29 U.S.C. § 216(b) on behalf of themselves and those individuals who may opt into the "FLSA Collective" defined as: "All healthcare workers who entered the United States through Defendant's foreign nurse recruitment program, and who were subject to Defendant's contracts requiring them to pay a 'termination fee' and 'remainder fee' to leave their jobs before the end of the contract term, from December 22, 2020 through the date of final judgment in this matter."

129.    The current and former employees described above are situated similarly to Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 216(b) and, therefore, Counts V and VI herein may be brought and maintained as an "opt-in" collective action pursuant to Section 16(b) of FLSA.

130.    Common proof applicable to Plaintiffs and the other workers will show that Defendant failed to pay wages as required by the FLSA to Plaintiffs and other similarly situated workers.

131.    These causes of action are also maintainable as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), because the prosecution of separate actions by individual members of the FLSA Collective would create a risk of inconsistent or varying adjudications with respect to individual current and former employees which would establish incompatible standards of conduct for Defendant.

132.    The names, last known addresses and cell phone numbers of the proposed FLSA Collective members are available to Defendant. Defendants therefore should be required to provide

Plaintiffs a list – including names, last known addresses, cell phone numbers, and email addresses if known – of all current and former employees who would be members of the proposed FLSA Collective.

133.    Notice of and an opportunity to join this lawsuit should be provided to all potential opt-in Plaintiffs both by first class mail to their last known address and by workplace posting, as well as by other practicable means including but not limited to text messaging, as soon as possible.

## CLASS ACTION ALLEGATIONS

134.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff asserts claims on behalf of and seeks to represent the follow Class: "All healthcare workers who entered the United States through Defendant's foreign nurse recruitment program, and who were subject to Defendant's contracts requiring them to pay a 'termination fee' and 'remainder fee' to leave their jobs before the end of the contract term, from December 22, 2013 through the date of final judgment in this matter.

135.    Plaintiffs reserve the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

136.    Numerosity: The Class is so numerous that joinder of all class members is impracticable.

137.    Adex's LinkedIn profile indicates that it has been employing and sponsoring foreign-born registered nurses in the United States since 2004.[2] The LinkedIn profile also indicates that Adex employs between 201 and 500 employees, and that 42 current LinkedIn members list Adex as their current workplace on their LinkedIn profile.[3]

---

[2] *See* https://www.linkedin.com/company/adex-medical-staffing/about/ (accessed December 16, 2023).
[3] *See id.* at "Company Size."

138.    Ms. Coralde estimates that there were about 60 nurses in her "batch" of Adex nurses alone, all of whom arrived in the U.S. at around the same time and underwent orientation together.

139.    Mr. Pajunar and Mr. Cutchon estimate that there were about 40 nurses in their "batch" of Adex nurses alone, all of whom arrived in the U.S. at around the same time and underwent orientation together.

140.    Plaintiffs believe that there are new batches of foreign nurses that arrive multiple times per year.

141.    Although the precise number of putative Class members is currently unknown, Plaintiffs believe that the Class includes more than forty members. These members can be identified based on Defendant's records, which would include information on employees' placement, length of employment and commitment period, and pay.

142.    Commonality: Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members, including but not limited to:

(a) Whether Defendant obtains/has obtained the labor of foreign healthcare workers by using serious harm or threats of serious harm in violation of the TVPA and New York trafficking law;

(b) Whether Defendant's uniform practices surrounding the commitment period, monetary penalties, and conditions of work constitute attempted labor trafficking in violation of the TVPA;

(c) Whether Defendant knowingly recruits/has recruited healthcare workers and knowingly benefit by their violations of the TVPA;

(g) The proper measure of damages for violations alleged; and

(h) The proper measure of punitive damages for violations allege.

143.     These common questions arise, in part, because of the uniform circumstances under which Plaintiffs and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of legal action and serious financial harm.

144.     Typicality: Plaintiffs' claims are typical of the members of the Class for the reasons set forth above. All members of the Class were subject to Defendant's uniform contracts. Defendant treated Plaintiffs consistently with other class members, in accordance with Defendant's standard policies and practices.

145.     Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiffs and the Class they seek to represent.

146.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant uses a uniform contract and uniform policies and practices, resulting in common violations of law. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum. To the extent any other

litigation exists, it was more likely than not initiated by Defendant as part of their pattern of obtaining forced labor by suing its former workers.

147.    Common questions of law and fact also predominate as to Plaintiffs' claim that Defendant attempted to obtain forced labor in violation of law. Defendant attempted to keep every healthcare worker in their employ through the threats of severe penalties and legal action, as well as through conditions of employment. That attempt was the same and uniformly made as to each and every employee.

148.    Plaintiffs intend to send notice to all members of the Class to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendant's records.

## COUNT I: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1589(a), ON BEHALF OF PLAINTIFFS AND THE CLASS

149.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth here.

150.    It is a violation of the TVPA to "knowingly provide[ ] or obtain[ ] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

151.    The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id*. § 1589(c)(2).

152.    Defendant obtained the labor of Plaintiffs and the Class through threats of serious financial penalties, through a scheme to make Plaintiffs and members of the Class believe they would suffer serious financial penalties, and through threatened abuse of its Arbitration Provision, including threats that employees would be required to pay a "termination fee" of up to $20,000 and a "remainder fee" of up to $15,000, and threats that employees will be responsible for paying Defendant's attorney's fees and the costs of arbitration, including arbitrator compensation, if they leave their jobs.

153.    These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm," in violation of 18 U.S.C. § 1589(a)(2)–(3).

154.    Defendant knowingly employed such threats to exert pressure on Plaintiffs and the Class to prevent employees from seeking employment elsewhere. This was done with the purpose of obtaining continued labor.

155.    Defendant's use of such means to obtain the labor of Plaintiffs and the Class was knowing and intentional.

156.    Plaintiffs and the Class have suffered damages because of Defendant's conduct. Those damages include emotional distress and other damages.

157.    Plaintiffs and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT II: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1589(b), ON BEHALF OF PLAINTIFFS AND THE CLASS**

158.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth here.

159.    It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

160.    Defendant has knowingly benefited from its participation in the forced labor venture described herein by earning substantial profits from the venture.

161.    Defendant knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

162.    Plaintiffs and the Class have suffered damages because of Defendant's conduct. Those damages include emotional distress and other damages.

163.    Plaintiffs and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT III: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1590(a), ON BEHALF OF PLAINTIFFS AND THE CLASS**

164.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth here.

165.    It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

166.    Defendant knowingly and purposefully recruited Plaintiffs and Class members, as described herein, in violation of the TVPA.

167.    Plaintiffs and the Class suffered damages as a result of Defendant's conduct, including emotional distress and other damages.

168.   Plaintiffs and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT IV: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1594(a), ON BEHALF OF PLAINTIFFS AND THE CLASS**

169.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth here.

170.   Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

171.   Defendant attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

172.   Plaintiffs and the Class suffered damages as a result of Defendant's conduct, including emotional distress and other damages.

173.   Plaintiffs and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT V: VIOLATION OF THE FLSA BECAUSE DEFENDANT'S CONTRACT REDUCES WAGES BELOW THE MINIMUM WAGE, ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED WHO MAY OPT INTO THE FLSA COLLECTIVE**

174.   Plaintiffs reallege and incorporates by reference the foregoing allegations as if fully set forth here.

175.   When Plaintiffs and others similarly situated worked for Adex, they were employed within the meaning of the FLSA.

176.   At all relevant times, Adex was an employer within the meaning of the FLSA.

177.   The "termination fee" and "remainder fee" provisions of Defendant's contract are intended to achieve purposes that are illegal under the FLSA, as they aim to force Plaintiffs and

others similarly situated to kick back to Defendant tens of thousands of dollars in penalties for leaving their jobs for costs that are principally for Defendant's benefit, and thus reduce the wages of Plaintiffs and others similarly situated during their last workweek below the federal minimum wage.

178.   The arbitration provision is also intended to achieve purposes that are illegal under the FLSA, as it aims to force Plaintiffs and the Class to kick back to Defendant its attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit—and thus reduce the wages of Plaintiffs and others similarly situated during the last workweek below the federal minimum wage.

179.   The "termination fee" and "remainder fee" provisions are thus illegal and unenforceable under the FLSA because they would, if enforced, permit Defendant to effectively pay its workers wages that are below the federal minimum wage.

180.   The arbitration provision is also illegal and unenforceable under the FLSA because it would, if enforced, permit Defendant to effectively pay its workers wages that are below the federal minimum wage.

181.   In satisfying its federal minimum wage obligations, Defendant may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include, among other purported damages, the termination fee, the remainder fee, Defendant's attorney's fees, and the costs of arbitration, including arbitrator compensation.

182.   Accordingly, because the recovery of these damages would reduce Plaintiffs' wages, and the wages of those similarly situated, in the last week of employment (and in many prior weeks of employment as well) to $0, below the federal minimum wage, the enforcement of the Defendant's contract would violate the FLSA.

183.    Additionally, the arbitration provision's requirement that employees pay Defendant's attorney's fees and the costs of arbitration if Defendant prevails in an arbitration is inconsistent with the one-way fee shifting provision in the FLSA, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in FLSA actions.

184.    Defendant's violations of the FLSA have been willful and intentional. Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiffs and other similarly situated current and former employees.

185.    Plaintiffs and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

### COUNT VI: VIOLATION OF THE FLSA FOR FAILURE TO PAY MINIMUM WAGE "FREE AND CLEAR", ON BEHALF OF PLAINTIFFS AND ALL OTHERS SIMILARLY SITUATED WHO MAY OPT INTO THE FLSA COLLECTIVE

186.    Plaintiffs reallege and incorporates by reference the foregoing allegations as if fully set forth here.

187.    When Plaintiffs and others similarly situated worked for Adex, they were employed within the meaning of the FLSA.

188.    At all relevant times, Adex was an employer within the meaning of the FLSA.

189.    The "termination fee" and "remainder fee" provisions of Defendant's contract are illegal under the FLSA, as they aim to force Plaintiffs and others similarly situated to pay Defendant tens of thousands of dollars in penalties for leaving their jobs for costs that are principally for Defendant's benefit.

190.    The arbitration provision is also intended to achieve purposes that are illegal under the FLSA, as it aims to force Plaintiffs and the Class to pay Defendant's attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit.

191.    Rather than paying Plaintiff and the FLSA Collective their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs. If they did leave their jobs, they would effectively have to repay all of the wages earned during the last pay period – by incurring these additional out-of-pocket expenses –  plus tens of thousands of additional dollars.

192.    By requiring Plaintiffs and other similarly situated employees to return their wages to Defendant if they left their jobs, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

193.    Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked free and clear.

194.    Defendant's violations of the FLSA have been willful and intentional. Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiffs and other similarly situated current and former employees.

195.    Plaintiffs and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

### Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves, the FLSA Collective, and the Class, demand a trial by jury as to all issues so triable.

**WHEREFORE**, Plaintiffs, on behalf of themselves, the FLSA Collective, and the Class, request that this Court enter an Order:

(a) assuming jurisdiction over this action;

(b) certifying this case as a class action under Fed. R. Civ. P. 23 with respect to Counts I through IV;

(c) declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216 with respect to Counts V and VI, and allowing employees to opt into the action;

(d) designating Plaintiffs as representatives for the Class and designating Plaintiffs' counsel as counsel for the Class;

(e) issuing proper notice to the Class at Defendant's expense;

(f) declaring that Defendant committed violations of the TVPA and the FLSA;

(g) permanently enjoining Defendant from further violations of the TVPA and the FLSA;

(h) awarding damages as provided by the TVPA, including punitive damages, and the FLSA;

(i) awarding reasonable attorneys' fees and costs as provided by law; and

(j) granting further relief, in law or equity, as this Court may deem appropriate and just, including all relief authorized by the TVPA and the FLSA.

DATED:    December 22, 2023
          New York, New York

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
Kakalec Law PLLC
80 Broad Street, Suite 703
New York, NY 10004
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**TOWARDS JUSTICE**

Juno Turner (she/her)
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org